**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **DOUGLAS BAKER,** | **CASE NO. 5:13CV2076** |
| **Plaintiff,** | **JUDGE DONALD NUGENT** |
| v. | **Magistrate Judge George J. Limbert** |
| **CAROLYN W. COLVIN**[1]**,** **ACTING COMMISSIONER OF** **SOCIAL SECURITY,** | **REPORT AND RECOMMENDATION** **OF MAGISTRATE JUDGE** |
| **Defendant.** | |

Douglas Baker ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

**I.    PROCEDURAL AND FACTUAL HISTORY**

Plaintiff applied for SSI in December 2009, alleging disability beginning May 1, 2008 due to neuropathy in his legs and carpal tunnel syndrome ("CTS") in his hands. ECF Dkt. #12 at 144, 159. Ths Social Security Administration denied his application initially and upon reconsideration. *Id*. at 78-82, 87-95. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and on March 28, 2012, the ALJ conducted a hearing and accepted the testimony of Plaintiff, who was represented by counsel, Plaintiff's sister, and a vocational expert ("VE"). *Id*. at 27-76. On April 19, 2012, the ALJ issued a Decision denying benefits. *Id*. at 10-19. Plaintiff requested review of the Decision, and on July 30, 2013, the Appeals Council denied review. *Id*. at 1-6.

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue.

On September 18, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On February 4, 2014, Plaintiff filed a brief on the merits. ECF Dkt. #15. On March 4, 2014, Defendant filed a brief on the merits. ECF Dkt. #16.  No reply brief was filed.

## II.      RELEVANT MEDICAL HISTORY

In her brief, Defendant reviews only Plaintiff's mental health history, noting that a review of Plaintiff's physical health history is unnecessary because he only challenges the ALJ's mental RFC for him.  While Defendant is correct that Plaintiff's only challenges concern his mental RFC, the undersigned recites the relevant medical history concerning Plaintiff's physical impairments as well.

### A.      Relevant Physical Medical History

On May 14, 2008, Plaintiff was taken to the emergency room after being shot in the buttock at a gas station.  Tr. at 214.  He was taken to the operating room and underwent an exploratory laparotomy with diverting colostomy after the bullet had gone through part of his rectum.  *Id*.  He was discharged on May 19, 2008 with diagnoses of a gunshot wound to the buttock, rectal injury secondary to the gunshot, right pubic rami fracture, and drug abuse.  *Id*.

In October of 2008, Plaintiff underwent nerve conduct testing and an EMG for his complaints of right leg numbness and weakness due to the gunshot wound.  Tr. at 346.  The testing showed diffuse right lumbosacral plexus injury affecting the upper plexus more than the lower.  *Id*. An x-ray of the lower spine for complaints of low back pain showed degenerative changes with minimal spurring.  *Id.* at 347.

Plaintiff underwent a colostomy takedown with resection and coloproctostomy on March 9, 2009 and a takedown of splenic flexure and repair of a ventral hernia.  Tr. at 299, 311.  In April of 2009, Plaintiff reported to the doctor that he was doing well except for some mild abdominal discomfort.  *Id.* at 297.  Upon examination, the doctor noted that the abdominal incision was healing well, the prior wound infection looked clean with minimal drainage and good granulation tissue. *Id*.  The doctor removed the staples and instructed Plaintiff to keep the wound dry and to pack the incision where it was opened.  *Id*.

On May 1, 2009, Plaintiff followed up from the surgery and complained of serious drainage from the wound, but no redness around the wound and no complaints of fever, abdominal pain, nausea, vomiting, diarrhea, or constipation. Tr. at 296. Upon examination, Dr. Beddell found that the wound was healing well with a very small 2 millimeter opening with no drainage and no erythema. *Id*. He recommended that Plaintiff follow up with his primary care physician for further care. *Id*.

On March 2, 2010, Dr. Vasiloff performed a medical examination of Plaintiff on behalf of the agency. Tr. at 363. He noted Plaintiff's chief complaint of neuropathy and the relevant medical history of Plaintiff's gunshot injury and colostomy and subsequent reversal. *Id*. Dr. Vasiloff assessed Plaintiff with lower extremity bilateral neuropathy, status post gunshot wound and opined that Plaintiff could work 2-4 hours of an 8-hour workday while standing and 8 hours of an 8-hour workday while seated. *Id*. at 365. He opined that Plaintiff could lift up to fifteen pounds, he had intact fine motor and communication skills and he could walk on flat or sloped surfaces, but he would have difficulty climbing ladders or flights of stairs. *Id.* Based upon the records in the file, Dr. McCloud completed a physical RFC form concerning Plaintiff on behalf of the agency on April 3, 2010 and opined that Plaintiff could frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty pounds, sit, stand and/or walk about six hours of an eight-hour workday, and could occasionally balance. *Id.* at 370-377.

A March 24, 2010 CT scan showed that Plaintiff had a single ventral hernia extending throughout most of his abdominal incision. Tr. at 411. It was recommended that Plaintiff undergo a component separation repair surgery, but only after he continue to lose weight. *Id.*

On September 10, 2010, Plaintiff was admitted to the hospital with a reducible ventral incisional hernia with partial small bowel obstruction. Tr. at 451. He was discharged on September 12, 2010 after undergoing a reduction of the hernia and receiving fluids. *Id*.

In October of 2010, Plaintiff was considered for colonic separation and hernia repair after being told to lose weight and losing eighteen pounds. Tr. at 407. However, Dr. Cullado wanted Plaintiff to weigh under 300 pounds and stop smoking before he would perform the surgery and in

December of 2010, it was noted that Plaintiff had gained 11 pounds and surgery was therefore postponed until he could lose weight. *Id*. at 406.

On February 3, 2011, Plaintiff presented to the emergency room with hernia pain and it was noted that such hernia pain had been a recurrent problem for Plaintiff. Tr. at 435. He was given medication and diagnosed with a reducible ventral hernia and told to follow up with his doctor. *Id*.

On April 11, 2011, Plaintiff followed up with a primary care physician and was diagnosed with mixed hyperlipidemia, obesity, gastroesophageal reflux disease, gout, neuropathy, restless legs syndrome, degenerative disc disease of the lumbar spine, tobacco use, and hernia. Tr. at 396. It was noted that Plaintiff reported that he was doing "ok" and reported "bipolar uncontrolled etc. + stressed." *Id*. at 397. On April 27, 2011, Plaintiff presented to the emergency room with abdominal pain and was diagnosed with an abdominal umbilical hernia. *Id*. at 418. He underwent surgery for the hernias in October of 2011 but returned to the hospital on November 13, 2011 until November 18, 2011 due to problems with a seroma after fluid and blood started leaking from the dislodged drain in his surgical site. *Id*. at 565-573, 618-621, 654-657.

### B.    Mental Health Medical History

As to his mental health history, Plaintiff was evaluated on November 21, 2006 while in prison. Tr. at 495. Intelligence testing showed that Plaintiff had average intellectual ability. *Id*.

Plaintiff was also evaluated on March 2, 2007 by Richland Correctional Institution prison psychiatrist Dr. Hasan after indicating that he was "freaking out" and was feeling "paranoid." Tr. at 471. Plaintiff related that since arriving in prison, he believed that people were always watching him. *Id*. It was noted that Plaintiff had a history of heavy drug and alcohol use. *Id*. Dr. Hasan reported that Plaintiff did not appear to have any hallucinations, although he reported that he could hear a dog whistle sometimes. *Id*. Plaintiff reported that he felt depressed, suspicious and anxious and he had once attempted suicide ten years ago, but he did not receive treatment in the past. *Id*. He also reported that he had heavily used alcohol, cocaine, methamphetamines and marijuana almost daily for the last 20 years and he used drugs in jails and prisons in the past. *Id*. Plaintiff also indicated that he never had a steady job and at most had held a job for a few weeks. *Id*. Plaintiff

noted that his current imprisonment was for using someone else's identity and his past imprisonments were related to drug abuse and trafficking. *Id*. at 471-472.

Upon examination, Dr. Hasan found Plaintiff to be very anxious, suspicious and guarded, with a depressed mood and anxious affect, no specific paranoid thoughts, but Plaintiff complained of occasionally hearing a dog whistle for the past 15 years. Tr. at 472.  Dr. Hasan diagnosed mood disorder, secondary to polysubstance dependence, and history of polysubstance dependence, and he wanted to rule out generalized anxiety disorder, paranoid schizophrenia and antisocial personality disorder. *Id.*  Dr. Hasan told Plaintiff that he believed that Plaintiff's mental health conditions were caused by his 20-year history of heavy alcohol and drug use. *Id.* at 473.  He prescribed Plaintiff Risperdal and Vistaril. *Id*.

While at the hospital in November of 2011, a psychiatric consultation was ordered after Plaintiff indicated that he was having active hallucinations. Tr. at 665.  Dr. Marley interviewed Plaintiff and found no psychiatric basis upon which to admit him. *Id*.  Dr. Marley diagnosed Plaintiff with depressive disorder not otherwise specified and noted that he had visual hallucinations possibly secondary to undiagnosed obstructive sleep apnea and/or narcolepsy. *Id*.  There were no current indicators for antipsychotic medications and Plaintiff declined medication for depression. *Id.* He was given a referral to Portage Path Behavioral Health Center for follow up as an outpatient. *Id*.

Clinical evaluation notes from Portage Path dated February 2, 2012 show that Plaintiff reported auditory hallucinations for the last 15 years and visual hallucinations of the same duration consisting of seeing a dog and people. Tr. at 725-737.  He reported that he saw a dog in his basement two days prior to the evaluation. *Id*.  He was diagnosed with recurrent severe major depressive disorder with psychotic features, anxiety disorder not otherwise specified, bipolar disorder not otherwise specified, polysubstance dependence in sustained full remission, and antisocial personality disorder. *Id*. at 745.  He was referred for a psychiatric evaluation at Portage Path. *Id*. at 745.

On February 23, 2012, Dr. Sharma, a psychiatrist at Portage Path, performed a psychiatric evaluation of Plaintiff. Tr. at 722-723.  Plaintiff reported hearing voices and seeing a homeless

-5-

person and others to Dr. Sharma.  *Id.* at 722.  Dr. Sharma observed that Plaintiff had clear speech, irrational thought content and a delusional thought process, with a flat affect, controlled behavior, impaired cognition, and poor insight and judgment.  *Id.*  He noted that Plaintiff was taking Paxil and Seroquel.  *Id.*  He diagnosed Plaintiff with major depression with psychotic features.  *Id*. at 723.

### C.  Hearing testimony

Plaintiff, who was forty-three years old at the time of the hearing, testified that he is not married, has no children, and lives with his father and sister, with whom he has lived since he was shot in 2008.  Tr. at 32-34. Plaintiff testified that he has not driven a car since he was shot because his legs feel numb and he does not trust his reaction time due to the numbness.  *Id*. at 35.

Plaintiff explained that when he had his most recent surgery, he was incarcerated at the time on a petty theft conviction stemming from an old outstanding warrant for a felony forgery conviction. Tr. at 36.  He admitted that he had been in and out of jail and prison for the last twenty years due to using drugs to self-medicate and not seeking mental health treatment.  *Id.* at 51. Plaintiff indicated that he last worked in 2008 when he and his cousin were repairing a fence and hanging drywall for Habitat for Humanity in a bad neighborhood.  *Id*.  He explained that someone saw him getting paid for the job and tried to grab the money out of his hand, but Plaintiff took the money back and the person pulled out a gun and shot him.  *Id.* at 37.  Plaintiff testified that he had not looked for a job since that time.  *Id.*

When asked at the hearing what he does during the day, Plaintiff replied that he plays guitar, watches television and plays with his dog.  Tr. at 38.  He noted that his sisters do his laundry and one of his sisters cleans and packs his wound twice a day.  *Id*.  He stated that he likes to go to church and guys from church come to his house to practice gospel songs so that they could hopefully play at the church one day.  *Id*. at 39.  Plaintiff reported that he earned his GED while in prison and he could read, but had difficulty doing so.  *Id*. at 39.

Plaintiff identified his leg neuropathy as the most significant medical problem that he had. Tr. at 40.  As to his mental health conditions, Plaintiff testified that he sees people, mainly a homeless person and a dog. Tr. at 47.  He indicated that he sees people "all the time," but he sees them the most every night.  *Id*. at 48.  He explained that he has had hallucinations for awhile and to

-6-

him it was not really a problem, until his father got mad because he stepped in a bowl of water that Plaintiff placed on the floor for dogs that Plaintiff hallucinated were there. *Id*. He also reported that when he was in jail, he had a "couple episodes" where mental health services were called, and while he was supposed to go for mental health treatment, he never did. *Id*. He testified that he was now trying to seek treatment because everyone around him was telling him to do so. *Id*. When his counsel asked him how his depression and anxiety affect him, Plaintiff responded that he just does not want to do anything and his sisters have to remind him to shower and to take his medications. *Id*. at 52.

The ALJ then questioned Plaintiff's sister, Donna French, who lives with Plaintiff. Tr. at 55. Ms. French testified that she lived with Plaintiff and their father and Plaintiff lived in the basement, while they lived upstairs. *Id.* at 57. She indicated that Plaintiff has had neuropathy for years and walked with a cane, and he had bipolar disorder and hallucinations. *Id*. at 58. As to Plaintiff's mental health, Ms. French testified that it was not very stable and she described his hallucinations about seeing dogs and people in the house and his focus on feeding these dogs or getting the dogs or people out of the house. *Id*. at 60-61. She believed that the hallucinations stem from the trauma that Plaintiff had endured. *Id*. at 61. She testified that Plaintiff can eventually be convinced that dogs and other people are not in the house. *Id*. She noted that getting Plaintiff to shower and to take his medications is getting better. *Id*. As to Plaintiff's ability to get along with others, Ms. French reported that Plaintiff was a likeable person and gets along with others, but he was not around a lot of people. *Id*. at 61-62. She also indicated that Plaintiff could concentrate "okay," and he could not do a lot of household chores because of his physical problems. *Id*. at 62.

The VE then testified. The ALJ presented nine hypothetical individuals to the VE and asked about the ability to work with each of the limitations provided as to each individual. Tr. at 65-71. The last hypothetical, upon which the ALJ ultimately relied, asked the VE whether work was available in significant numbers in the national economy for a hypothetical individual who had the same age, education and work experience as Plaintiff, with a sedentary work level and a sit or stand alternative at will option; being off task no more than 10% of the time during the work period; with the ability to use a cane to ambulate; occasional foot control operation bilaterally; no climbing of

-7-

ladders, ropes or scaffolds; occasional climbing of ramps or stairs; frequently balancing; occasionally stooping, kneeling, crouching and crawling; never using moving machinery or exposure to unprotected heights; limitations to simple, routine, repetitive tasks, in an environment free of fast pace production requirements, with only simple work-related decisions and routine workplace changes and frequent interaction with the public and co-workers. *Id.* at 65-71.  The VE testified that such jobs existed for this hypothetical individual, such as the jobs of inspector, patcher, and touch up screener. *Id.*

### III.   **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from obesity, bilateral lower extremity neuropathy, hernias, a psychiatric history of mood disorder, and polysubstance abuse, which qualified as severe impairments under 20 C.F.R. §404.1520(c) and 416.920(c).  Tr. at 12. The ALJ characterized Plaintiff's status post gunshot wound, colostomy, anemia, seroma, and CTS as non-severe impairments and provided explanations for doing so. *Id.*

The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926 ("Listings").  Tr. at 12-14.  The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 416.967(a), except that he needed to sit or stand alternatively and at will, but would not be off task more than 10% of the work period, he could occasionally operate foot controls bilaterally, he could never climb ladders, ropes, or scaffolds, and could only occasionally climb ramps and stairs; he could frequently balance, but only occasionally stoop, kneel, crouch, and crawl;  he could never use moving machinery or be exposed to unprotected heights; his work must be limited to simple, routine and repetitive tasks in a work environment free from fast-paced production requirements and involving only simple work-related decisions and routine workplace changes; he could have frequent interaction with the public and co-co-workers and he requires a cane when ambulating around the workplace. *Id*. at 14.

Based upon VE's testimony, the ALJ ultimately concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform, including the representative

occupations of inspector, patcher and touch up screener. Tr. at 19. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to SSI.

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI.  ANALYSIS

Plaintiff's assertions in this case relate only to the ALJ's determination of his mental RFC.  Plaintiff contends that the ALJ erred by failing to take into account that Plaintiff would be off task due to his hallucinations and by finding that Plaintiff could have frequent contact with the public and co-workers.  ECF Dkt. #15.

It is the ALJ who is responsible for determining a claimant's RFC.  20 C.F.R. § 404.1546(c); *Fleisher v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011).  The RFC is the most that a claimant can still do despite his restrictions.  SSR 96-8p.  It is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id*.  It is a claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." *Id*.  The Ruling defines a "regular and continuing basis" as 8 hours per day, five days per week, or the equivalent thereof. *Id.*

In determining a claimant's RFC, SSR 96-8p instructs that the ALJ must consider all of the following: (1) medical history; (2) medical signs and lab findings; (3) the effects of treatment, such as side effects of medication, frequency of treatment and disruption to a routine; (4) daily activity reports; (5) lay evidence; (6) recorded observations; (7) statements from medical sources; (8) effects caused by symptoms, such as pain, from a medically determinable impairment; (9) prior attempts at work; (10) the need for a structured living environment; and (11) work evaluations. SSR 96-8p. The ALJ must provide "a narrative discussion "describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." *Id*.  The ALJ must also thoroughly discuss objective medical and other evidence of symptoms such as pain and set forth a "logical explanation" of the effects of the symptoms on the claimant's ability to work. *Id.* However, "[ a]n ALJ need not discuss every piece of evidence in the record in order for his decision to stand." *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661,665 (6th Cir. 2004), unpublished.

### A.   Off-task Limitation

Plaintiff first asserts that the ALJ failed to consider that he would be off task 15% of the time during a work period due to his hallucinations. ECF Dkt. #15 at 16. The undersigned recommends that the Court find that the ALJ did consider such an off-task limitation as he presented a hypothetical individual to the VE who had a limitation that resulted in him being off task during the work period. Tr. at 69. He also included an off-task limitation in his RFC for Plaintiff. *Id*. at 17.

Upon presentation by the ALJ at the hearing of a hypothetical individual with numerous limitations, including an off-task limitation, the VE testified that competitive employers allowed anywhere up to a 10-15% off-task rate during the work period due to mental or physical fatigue. Tr. at 69.  In his decision, the ALJ thereafter included an off-task rate of no more than 10% in the RFC that he found for Plaintiff. *Id*. at 15. While the ALJ's off-task rate of 10% appears to be based upon Plaintiff's physical limitations, the fact remains that the ALJ nevertheless included an off-task rate. Whether it should have been 10% or 15% or whether it should have been based upon physical limitations and/or mental limitations is of little consequence, since the VE testified that competitive employers tolerated employees being off task anywhere between 10% and 15% of a workday.

-11-

Moreover, substantial evidence supports the ALJ's off-task finding. No mental health professional opined that an off-task limitation due to Plaintiff's mental health conditions was necessary. Further, Plaintiff presents no evidence that a greater percentage should have been found. The ALJ reviewed the medical evidence concerning Plaintiff's mental health and he cited to Plaintiff's testimony concerning his hallucinations. Tr. at 14-16. He noted that while Plaintiff reported active hallucinations during his November 13, 2011 hospital stay due to physical issues, the psychiatry department evaluated Plaintiff and cleared him for discharge after assessing him with depressive disorder not otherwise specified and finding no mental health reason for admitting him. *Id*. at 14-16, 665. The consulting doctor believed that the hallucinations resulted from Plaintiff having an undiagnosed obstructive sleep apnea and/or narcolepsy. *Id*. at 665. The ALJ noted that the medical records also showed that Plaintiff had declined medication for the depression diagnosis. *Id*. at 17, 665. The ALJ also assigned weight to psychiatrist Dr. Sharma's diagnosis of major depression with psychotic features and his assessment that Plaintiff's mental impairments caused only moderate impairment. *Id*. at 17, 722. The ALJ noted that on February 23, 2012, Dr. Sharma evaluated Plaintiff and found that he was taking Paxil and Elavil, his behavior was controlled, and he added Seroquel to Plaintiff's medications. *Id*. The ALJ also noted that Plaintiff was able to function without supervision or psychiatric hospitalization, which negated a finding of greater limitations on Plaintiff's mental work-related abilities. *Id*. at 21.

For the above reasons, and keeping in mind the standard of review, the undersigned recommends that the Court find that the ALJ reasonably considered an off-task limitation for Plaintiff and included it in his RFC for Plaintiff. The undersigned further recommends that the Court find that substantial evidence supports the ALJ's finding of a 10% off-task rate limitation.

### **B.     Frequent Contact with the Public and Co-workers**

Plaintiff also contends that the ALJ erred in finding that he could have frequent contact with the public and co-workers. ECF Dkt. #15 at 16. Again, as with the off-task limitation, the undersigned recommends that the ALJ reasonably found that Plaintiff could perform jobs that had frequent contact with the public and co-workers and substantial evidence supports the ALJ's determination. First, no mental health professional opined that Plaintiff was limited in his ability

-12-

to interact with the public and co-workers and Plaintiff presents no such evidence.  In addition, Plaintiff's sister testified that he was a likeable person and gets along with others.  *Id*. at 61-62.  The ALJ also cited to Plaintiff's lack of psychiatric hospitalizations and Dr. Sharma's assessment that Plaintiff's behavior was controlled and his major depressive disorder with psychotic features resulted in only a moderate limitation.  *Id*. at 17.  Such evidence constitutes substantial evidence to support the ALJ's finding that Plaintiff could perform jobs that required frequent contact with the public and co-workers.

## VII.  CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.


DATE: January 26, 2015

                                     */s/George J. Limbert*
                                     GEORGE J. LIMBERT
                                     UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

-13-